UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


HORACE CRUMP, JR.,

        Petitioner,                              Hon. Richard Alan Enslen

v.                                              Case No. 1:02-CV-499

KENNETH McKEE,

        Respondent.
_____/


## REPORT AND RECOMMENDATION

        This matter is before the Court on Crump's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Crump's petition be **denied**.


## BACKGROUND

        As of March 1995, Freddie Campbell (a.k.a. Keebler) was a drug dealer working from a residence at 3196 Canton Street. (Trial Transcript, January 23, 1996, 69-74). Petitioner was employed as a member of Keebler's drug selling operation. Specifically, Keebler paid Petitioner for "watching his back and getting the door." *Id.* at 176-77. Petitioner was not paid in cash, but was instead compensated with food, beer, marijuana, and sexual favors. *Id.* at 177. Keebler was "about five feet" tall and weighed

"between 135 and [1]40 pounds." *Id.* at 75. Petitioner was over six feet tall and weighed approximately 250 pounds. (Trial Transcript, January 24, 1996, 11).

On the morning of March 22, 1995, officers with the City of Detroit Police Department arrived at 3196 Canton in response to a report that a man had been assaulted. (Trial Transcript, January 23, 1996, 77, 120-22). Upon entering the house, officers observed blood covering the walls and floor. *Id.* at 78, 122. Officers also discovered several human teeth laying on the floor. *Id.* at 80, 123. In another area of the house, officers discovered a blood-soaked sofa. *Id.* at 80, 123. Sitting on top of the sofa was a wooden post 31 inches long and two inches wide. *Id.* at 80, 124. One end of this post was covered in blood. *Id.* at 80, 124. Officers also discovered a butcher knife with blood stains on the blade. *Id.* at 80, 123.

The officers discovered Keebler's body "in the back dining room area." *Id.* at 57, 60-61, 78. Keebler had suffered "many" blunt trauma wounds to his head, was missing several teeth, suffered several stab wounds to the face and stomach, and exhibited a "very large wound across the neck." *Id.* at 79, 125. An investigation revealed that Keebler had been initially assaulted "at or on the sofa," after which his body was dragged into the dining room where he was further victimized. *Id.* at 126-29. The officers uncovered no evidence that other violence had occurred at the residence and there was, likewise, no evidence that the house had been ransacked, burglarized, or forcibly entered. *Id.* at 129-34.

At approximately 12:30 p.m. on the afternoon of March 22, 1995, Officers Bartee Smith and Wiley Stewart were dispatched to a local "adult home" because "they was holding one for violation of parole." *Id.* at 85-86, 98-100. Upon their arrival, the officers were directed to speak with Petitioner. *Id.* at 86-87, 99-101. When they approached Petitioner, Officer Smith observed blood on Petitioner's shoes, coat, and hands. *Id.* at 88.

When he was asked where this blood originated, Petitioner informed the officers that he had been helping a friend that "got beat up." *Id.* at 88, 104-05.  Specifically, Petitioner stated that he had been at the Canton residence with Keebler, when "two guys forced their way into the house." *Id.* at 89, 104.  Petitioner claimed that these two men "tied him up" and then began assaulting Keebler. *Id.* at 89, 104.  According to Petitioner, he was able to untie himself, after which he attempted to help Keebler. *Id.* at 89, 104-05.  Petitioner stated that he then left the house and phoned his probation officer. *Id.* at 89, 105.  The officers did not arrest Petitioner because they "thought he was a witness" to Keebler's murder. *Id.* at 90, 107-08.

On March 24, 1995, Petitioner was questioned by Officer Monica Childs. *Id.* at 172-73.  Petitioner's subsequent statement was read into the record at trial by Officer Childs:

| | |
|---|---|
| Ms Brue: | Would you read to me the statement that you took from the Defendant, Horace Winfred Crump Jr., please? |
| Ms. Childs: | This is the statement of Horace Winfred Crump, Jr. dated 3-24-95.  The typed statement began at 9:35 a.m. at 1300 Beaubien at the Homicide Section in squad four. |
| | Question:    Mr. Crump, have you been advised of your constitutional rights? |
| | Answer:       Yes. |
| | Question:    Do you have any questions regarding your rights? |
| | Answer:       No. |
| Ms. Benson: | Objection.  That is not what that says. |
| Ms. Childs: | There is a typographical error.  Do you want me to read it just as -- |
| Ms. Benson: | Please. |

Ms. Childs:    Do you have -- the word is ant, should have been any questions about your rights?

Answer:    No.

Question:    Do you understand your rights?

Answer:    Yes.

Question:    Have you been threatened or promised favorable treatment in exchange for your statement?

Answer:    No.

Question:    Has any member of the Detroit Police Department verbally or physically abused you since you have been in police custody?

Answer:    No.

Question:    Have you been denied food, sleep, restroom privileges, or the opportunity to contact an attorney since you have been in custody?

Answer:    No.

Question:    Did I, Officer Childs, do anything to discourage you from contacting an attorney or family member?

Answer:    No.

Question:    Is it your desire at this time to give a voluntary statement regarding the fatal assault and stabbing of Freddie Campbell?

Answer:    Yes.

Ms. Brue:    Officer Childs, let me stop you right there.  After the Defendant's answers to each of your questions, did you ask him to do anything?

-4-

Ms. Childs: Yes. I asked him to place his signature next to his response, indicating that that was the question I had asked him and that response was his response.

Ms. Brue: Did he do so?

Ms. Childs: Yes, he did.

Ms. Brue: Continue, please.

Ms. Childs:

Question: Mr. Crump, would you tell me in your own words about your involvement in the incident?

Answer: I had been working at the house on Canton with Keebler since March the 7th watching his back and getting the door. Keebler was holding the sack. I didn't get paid with money because I had started hanging around so much, I had just started living there. And he would buy me food and beer and we smoked weed. And if I wanted to have sex with a girl who came through there he would pay for it, like he would give her a rock.

This past Tuesday night, me, Keebler, Gail, and Carl had went over to Curt's house to pick up a three hundred dollar sack. Keebler had told me that he was going to pay me when he got the three hundred dollar sack. We went back over on Canton and on the, over there we picked up Tony on Gratiot and we all went back on Canton. Carl and Dale told Keebler that Curt said he would pay them for working at one of Curt's house. Keebler gave each one of them a rock and Tony bought a five dollar rock. Dale and Carl left and Tony was in the kitchen smoking his rock. Then Tony asked

Keebler for some credit and Keebler told me to kick him out and I put Tony out.

Since Keebler had already told me he -- "

Typographical error again.  Do you want me to read it just like it is?

Ms. Brue:   Sure.  Read it and then tell us what it should be.

Ms. Childs:   Okay.  It says, "Keebler had told me he wad gone pay me --"  The word should be, was gonna pay me.

"-- I ask him about my money and he started going off about the sack was ten dollars short Monday. And I told him to take out for that.  Then he was fussing because I had woke him up to sell a five dollar rock and the girl only had three dollars and 50 cents. I was still telling him I wanted my sixty dollars he had promised for working.  I said, I see everybody else didn't have to wait for they money.  I wasn't hollering or cussing or nothing. He pulled his gun out and walked to the dining room table.  He hadn't pointed the gun at me or said he was going to do nothing, but he was fussing and cussing.

When Keebler went back to the couch to put the gun under the pillow, I felt like he had went too far even just pull it out.  And I was already thinking to myself, if he turned his back or put the gun back I was gonna grab him or hit him or do something.  But I knew I was going to get him for pulling the gun out.  While he was bending over the couch that's, when I hit him with the wood pole.  He kept moving like he was trying to reach for the gun.  It was in between the couch pillow and the back of the couch.  I kept hitting him.  He was trying to get away and he stumbled to the front door and stopped hitting him.  And when he got to the door I ran and hit him some more and he fell down by the window.  That's when I went into the kitchen and got the knife.

When I came back he was trying to get up and I cut his throat.  I just went to the work I just went to work with the knife, and I don't know where else I might have cut him.

There is a missing word there.

I him away from the door into the dining room, and I went and sat on the loveseat by the window and looked out the window.  One

-6-

of them females off Mack knocked on the back door and I went and told her wasn't nothing happening.  Then I started going through the pillows on the couch.  I knew where the gun was.  It was between the pillow you sit on and the back of the couch.  The reached into the pillow on the back of the couch and got he money.  It was about 50 dollars.  I reached into the other side (the middle back pillow) and pulled out a cigarette pack and a lighter and the rocks were inside the cigarette pack.

I went into the kitchen and found a stem and smoked the rocks.  It was about 18 or 20 of them.  I kept looking out the window.  After a while I left and went down the street to Jean's house, and I sent her to buy four rocks.  We smoked those and I left and went to Effective Alternatives.  I went in and called my parole officer, Mr. Wardford, and told him I was in some trouble.  I knew I had violated but I didn't tell anybody what I did.

Question:    Mr. Crump, did we just interrupt this statement at your request so that you could make a phone call?

Answer:     Yes.

Question:    Mr. Crump, what type of gun did you steal from 3196 Canton?

Answer:     A .32 silver.  I was so high after I took it, I don't even know where it is.

Question:    Who is Keebler?

Answer:     The guy, Freddie I beat up and cut on Canton.

Question:    Did Freddie Campbell, Jr. fire any shots at you before/during the assault and stabbing?

Answer:     No.

Question:    When did this incident take place?

Answer:     Wednesday morning, close to three in the morning.

-7-

| | |
|---|---|
| Question: | Did Freddie Campbell threaten to shoot you during the argument about your payment? |
| Answer: | No [and the answer continues in the Defendant's handwriting] not verbally, but he was waving the gun and cussing. |
| Question: | Did he ask you to leave afterwards? |
| Answer: | No. |
| Question: | On Wednesday, 3-22-95, did I, Officer Childs, refuse to take a statement from you regarding this incident? |
| Answer: | Yes. |
| Question: | Did I tell you why I would not take your statement? |
| Answer: | Yes.  You said it seemed like I was still high and you didn't want me to talk to you or anybody else about what happened. |
| Question: | Did anyone else attempt to talk to you regarding this incident? |
| Answer: | A black guy took me upstairs when you left, but he didn't really talk to me.  I was tired. |

*Id.* at 174-82.

At trial Petitioner's counsel acknowledged that Petitioner was responsible for the death of Freddie Campbell.  *Id.* at 48.  Petitioner asserted, however, that he acted in self-defense or, in the alternative, was incapable of forming the specific intent to kill necessary to convict him of first degree murder.  (Trial Transcript, January 23, 1996, 48-52; Trial Transcript, February 5, 1996, 4).

In support of his theory, Petitioner presented testimony from licensed psychologist, Dean Shappell, Ph.D.  (Trial Transcript, January 24, 1996, 69).  Dr. Shappell testified that at the time of the killing, Petitioner lacked the ability to form the specific intent to kill.  *Id.* at 101.  According to Dr. Shappell, Petitioner "has a generalized fear of guns" and responded to the incident with Keebler by automatically - without thought - relying on his survival instinct and simply acted to save his own life.  *Id.* at 80-81, 97-101, 129.  Dr. Shappell acknowledged that Petitioner, despite his alleged fear of guns, had previously been convicted of carrying a concealed weapon.  *Id.* at 125.

In response, the State presented the testimony of clinical psychologist, Shara Johnson, Ph.D.  (Trial Transcript, February 5, 1996, 4).  After examining Petitioner, Dr. Johnson concluded that at the time of Keebler's killing, Petitioner was able to formulate the specific intent to kill.  *Id.* at 12-13.  The doctor based this conclusion on her determination that Petitioner's actions were "goal-directed" and exhibited logic and forethought.  *Id.* at 13.

Dr. Johnson stated that the fact that Petitioner waited until after Keebler had set down his gun to attack signified that Petitioner "did not feel any particular threat at that time and the assault was purely his decision."  *Id.* at 25-26.  The doctor testified that the fact that Petitioner resumed his attack on Keebler after he had attempted to escape was "significant, in that, again [Petitioner] was executing behavior that was goal directed."  *Id.* at 26.

Dr. Johnson testified that the fact that after beating Keebler into submission, Petitioner "went into the kitchen to obtain a weapon," demonstrated that Petitioner "was able to formulate his intent at that time and, in fact, did what he intended to do with the knife. . .which was to cut the throat of the victim."  *Id.* at 27.  The doctor further observed that Petitioner's attempt to "avoid detection" for his actions was "consistent with goal-directed behavior."  *Id.* at 30.  Finally, Dr. Johnson testified that

there was no evidence that Petitioner possessed a fear of guns. *Id.* at 18. In this respect, the doctor observed that after killing Keebler, Petitioner took his gun. *Id.* at 31.

Following a bench trial, Petitioner was convicted of first degree murder. *Id.* at 113. Petitioner was sentenced to life in prison. (Sentencing Transcript, March 22, 1996, 4). Petitioner appealed his conviction to the Michigan Court of Appeals, asserting the following claim:

> I.    Defendant was denied due process of law when the trier of fact improperly interpreted the law of diminished capacity to require evidence of mental illness.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Crump*, No. 195491, Opinion (Mich. Ct. App., July 29, 1997). Asserting the same issue, Petitioner subsequently submitted in the Michigan Supreme Court a delayed application for leave to appeal. The court denied Petitioner's request. *People v. Crump*, No. 110421, Order (Mich., June 29, 1998).

Petitioner later filed in the trial court a motion for relief from judgment in which he asserted the following claims:

> I.    Defendant was denied a fair trial and due process when the examining magistrate allowed the admittance of Defendant's inculpatory statement before the corpus delicti was established beyond a reasonable doubt.
>
> II.   Defendant was denied A) effective assistance and due process when his motion to substitute counsel was denied, where it was timely, an adequate inquiry was not conducted and the court ignored the conflict, which ultimately prevented an adequate defense, B) his right against self-incrimination and due process when it was found that his statement to police was voluntary, where the trial court failed to conduct a bifurcated inquiry and consider the totality of the circumstances in determining whether Defendant voluntarily and knowingly and intelligently waived his Miranda rights, C) a fair trial and due process when it was found that the prosecution had

-10-

sustained its burden of proof, where the evidence offered was insufficient to show the elements of premeditation, deliberation and intent to kill beyond a reasonable doubt, D) a fair trial and due process, where the trial court permitted the introduction of a prior bad act whose prejudicial effect far outweighed its probative value, and E) a fair trial and due process when it was found that the burden of proof was sustained, where the evidence offered was insufficient to show the mental state required to commit premeditated murder and negate proof of insanity beyond a reasonable doubt.

III.   Defendant was denied effective assistance of counsel and due process, where his trial attorney failed to A) raise a motion for or request a continuance to prepare for an evidentiary hearing, B) investigate and assert the viable defense of insanity, C) advise client of his right to testify at trial, D) make a timely objection to prejudicial prior acts evidence, and E) motion for further psychiatric testing so defense expert could make firm conclusions.

IV.   Defendant was denied a fair trial and due process, where the prosecution committed acts of misconduct by A) failing to show due diligence in presenting an endorsed res gestae witness, and B) introducing a prior bad act of Defendant that was neither material nor probative.

V.   Defendant's non-parolable mandatory life sentence for first-degree murder was violative of Michigan's Constitution because it is an indeterminate sentence and because it constitutes cruel and unusual punishment.

VI.   Defendant was denied effective assistance of counsel and due process, where his appellate counsel failed to file claims of ineffective assistance of counsel on his trial attorney.

The trial court denied Petitioner's motion on the ground that he failed to establish good cause for his failure to assert such issues in his direct appeal as of right. *People v. Crump*, No. 95-4183,

-11-

Opinion (Third Judicial Cir. Ct., Sep. 13, 2000). Petitioner appealed this decision to the Michigan Court of Appeals, asserting the following claims:

    I.      Defendant-Appellant was denied due process, where there was insufficient evidence to support his conviction.

    II.     Defendant-Appellant was denied his right against self-incrimination and due process, where his statement was found voluntary.

    III.    Defendant-Appellant was denied effective assistance of counsel, where his motion to substitute counsel was denied.

    IV.    Defendant-Appellant was denied due process, where a non-probative, irrelevant and immaterial prior crime was admitted.

    V.     Defendant-Appellant was denied due process, where there was insufficient evidence of the required mental state and to negate proof of insanity.

    VI.    Defendant-Appellant was denied effective assistance of counsel, where his trial counsel made serious errors that prejudiced his defense.

        A.    Failure to request a continuance.

        B.    Failure to raise insanity.

        C.    Failure to object.

        D.    Failure to advise client of his right to testify.

    VII.   Defendant-Appellant was denied his right to a fair trial and due process, where the prosecution committed acts of misconduct that effected the trial.

        A.    The prosecution introduced, without notice, a prior bad act that was neither relevant, material nor probative.

B.    The prosecution failed to show due diligence in presenting an endorsed res gestae witness.

VIII.   Defendant-Appellant was denied due process, where the magistrate allowed his statement to be admitted.

IX.   Defendant-Appellant was denied effective assistance of counsel, where his appellate counsel refused to file claims of ineffectiveness on his trial counsel.

Petitioner's appeal was dismissed "for failure to pursue the case in conformity with the rules." *People v. Crump*, No. 236536, Order (Mich. Ct. App., Nov. 7, 2001). Asserting the same issues, Petitioner moved in the Michigan Supreme Court for leave to appeal this determination. The court denied Petitioner's request on the ground that it was "not persuaded that the questions presented should be reviewed by this Court." *People v. Crump*, No. 120449, Order (Mich., May 29, 2002). On July 9, 2002, Crump filed the present petition for writ of habeas corpus in which he asserts the following claims:

I.    The conviction was obtained by insufficient evidence of premeditation and deliberation.

II.   The conviction was obtained by use of a coerced confession and a violation of the privilege against self-incrimination.

III.   Petitioner was denied effective assistance of counsel where it was clearly shown that there was a breakdown in communication and trial counsel was unprepared.

IV.   The conviction was obtained by use of a non-probative, irrelevant and immaterial prior crime.

V.    The conviction was obtained by insufficient evidence of the required mental state and to negate proof of insanity.

VI.     Petitioner was denied effective assistance of counsel where trial counsel failed to (a) request a continuance, (b) raise insanity, (c) object, and (d) advise Petitioner of his right to testify.

VII.    The conviction was obtained by the prosecution's unconstitutional use of Petitioner's prior conviction.

VIII.   The conviction was obtained by the magistrate allowing Petitioner's statement to be admitted before proof of the corpus delicti.

IX.     Petitioner was denied effective assistance of appellate counsel where appellate counsel refused to file claims of ineffective assistance of trial counsel.

## STANDARD OF REVIEW

Crump's petition, filed July 9, 2002, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)     An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

-14-

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably

extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

The deferential standard articulated by the AEDPA, however, does not apply if the state has failed altogether to review a particular claim. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts a *de novo* review. *See McKenzie*, 326 F.3d at 727; *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

None of the issues presented in Crump's petition were adjudicated on the merits in the state courts. As discussed above, the trial court and the Michigan Court of Appeals declined to address

the merits of Petitioner's claims on the ground that he failed to comply with certain procedural rules. The Michigan Supreme Court declined to address the merits of Petitioner's claims because it was not persuaded that Petitioner's claims merited review. Thus, the claims advanced in Crump's petition for writ of habeas corpus are subject to *de novo* review by this Court.

## ANALYSIS

### I.     Petitioner has not Procedurally Defaulted any of His Claims

The claims presented in Crump's petition were first advanced in his post-conviction motion for relief. As noted above, the trial court determined that Petitioner had procedurally defaulted his claims. Petitioner appealed this determination to the Michigan Court of Appeals which dismissed Petitioner's appeal for failure to comply with a separate and distinct set of procedural rules. Respondent argues, therefore, that Petitioner has procedurally defaulted the claims presented in this Court.

To find that a petitioner has procedurally defaulted a particular claim, "the last state court rendering a judgment in the case must have based its judgment on the procedural default." *Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). Petitioner appealed the decision of the Michigan Court of Appeals to the Michigan Supreme Court which also denied Petitioner's appeal. However, the decision by the Michigan Supreme Court was not based on procedural default. Instead, the court simply denied Petitioner's appeal on the ground that it was "not persuaded that the questions presented should be reviewed by this Court." *People v. Crump*, No. 120449, Order (Mich., May 29, 2002). Thus, Petitioner has not procedurally defaulted his claims.

**II.**          **Sufficiency of the Evidence Claims (Habeas Claims I and V)**

Petitioner asserts that he is entitled to habeas relief because there did not exist sufficient evidence to support his conviction for first degree murder.  Specifically, Petitioner asserts that there did not exist sufficient evidence from which to conclude that he acted with premeditation and deliberation. Petitioner further asserts that there did not exist sufficient evidence to support the conclusion that he acted with the intent to kill.  Finally, Petitioner claims that the prosecution did not present evidence to "negate proof of insanity."

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.  *See Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)).

Under Michigan law then in effect, the elements of first degree murder were: (1) the defendant intentionally killed the victim, and (2) the act of killing was premeditated and deliberate.  *See People v. Schollaert*, 486 N.W.2d 312, 318 (Mich. Ct. App. 1992).  Premeditation and deliberation require "sufficient time to allow the defendant to take a second look." *Id.*  The elements of first degree murder "may be inferred from all the facts and circumstances surrounding the incident."  *People v. Haywood*, 530 N.W.2d 497, 503 (Mich. Ct. App. 1995) (premeditation and deliberation may be inferred from circumstances); *People v. Price*, 1997 WL 33353593 at *1 (Mich. Ct. App., Mar. 7, 1997) (intent may be inferred from circumstances) (citing *People v. Safiedine*, 414 N.W.2d 143 (Mich. Ct. App. 1987)).  Moreover, intent to kill may be inferred from the use of a lethal weapon or "from conduct the

natural tendency of which is to cause death or great bodily harm." *See Price*, 1997 WL 33353593 at *1 (citing *People v. Ray*, 224 N.W.2d 735 (1974)).

As Petitioner stated to Officer Childs, when Keebler pulled out his gun he "was already thinking to myself, if [Keebler] turned his back or put the gun back I was gonna grab him or hit him or do something. But I knew I was going to get him for pulling that gun out." Petitioner further stated that he stopped hitting Keebler when he attempted to escape, but "when he got to the door I ran and hit him some more." Finally, after beating Keebler into submission, Petitioner "went into the kitchen and got the knife" that he used to kill Keebler. This evidence reveals that Petitioner's actions were planned and intentional. Moreover, Petitioner had several opportunities to "take a second look" and reconsider his actions. The Court finds, therefore, that there exists sufficient evidence that Petitioner acted with premeditation and deliberation in this matter.

As for Petitioner's claim that he lacked the capacity to formulate the intent to kill, the Court is not persuaded. While Dr. Shappell testified that Petitioner lacked the ability to form the intent to kill, Dr. Johnson testified that Petitioner was able to formulate the specific intent to kill Freddie Campbell. When viewed in a light most favorable to the prosecution this competing testimony supports the finding that Petitioner was able to (and did) formulate the specific intent to kill Freddie Campbell. This conclusion is further supported by the evidence discussed above, from which a reasonable juror could infer that Petitioner acted with the intent to kill. The Court finds, therefore, that there exists sufficient evidence that Petitioner acted with the intent to kill.

Finally, Petitioner asserts that the prosecution failed to "negate proof of insanity." Under Michigan law then in effect, Petitioner was required to serve written notice of the intent to assert the defense of insanity. *See* Mich. Comp. Laws § 768.20a(1) (West 1995). Because Petitioner did not serve

notice of the intent to assert an insanity defense, the prosecution cannot have been required to present evidence negating such a defense. This claim is without merit.

In sum, for the reasons discussed above, the Court concludes that there exists sufficient evidence to support Petitioner's conviction for first degree murder.

**III.          Coerced Confession Claim (Habeas Claim II)**

Petitioner asserts that his confession to Officer Childs was coerced, thus rendering invalid his conviction.

To the extent that Petitioner is claiming that his waiver of his right to remain silent was less than voluntary, such is evaluated by examining the totality of the circumstances to assess whether his purported waiver was voluntary, knowing, and intelligent. *See Seymour v. Walker*, 224 F.3d 542, 553-54 (6th Cir. 2000). Furthermore, there "must be an element of police coercion in order for a waiver to be found involuntary." *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157, 169-71 (1986)). The record contains no evidence of police coercion. Furthermore, there exists no evidence suggesting that Petitioner's waiver of his Miranda rights was anything but voluntary.

To the extent that Petitioner claims that his actual statements, as opposed to the waiver of his Miranda rights, were less than voluntary, the result is the same. To prevail on such a claim, Petitioner must establish that (a) the police engaged in objectively coercive activity, (b) sufficient to overcome Petitioner's will, and (c) that such activity was the "crucial motivating factor" in Petitioner's decision to make the allegedly involuntary statement. *See United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002). The record contains no evidence from which a reasonable person could conclude that Petitioner was coerced into making any statements to the police.

**IV.**          **Prior Bad Acts Claims (Habeas Claim IV and VII)**

As noted above, Dr. Shappell testified that Petitioner was unable (at the time of the killing) to formulate the specific intent to kill Freddie Campbell.  The doctor's theory was that because Petitioner feared guns, he responded to the incident with Campbell by automatically (and without thought) acting on instinct to save his life.  On cross-examination, the prosecutor challenged Dr. Shappell on this point by asking him whether he was aware that Petitioner had previously been convicted of illegally possessing a firearm.  (Trial Transcript, January 24, 1996, 125).  Dr. Johnson later testified that Petitioner informed her that he had previously been convicted for illegally possessing a firearm. (Trial Transcript, February 5, 1996, 18-19).  Petitioner asserts that the admission of this testimony regarding this prior conviction merits a reversal of his conviction.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding.  *See Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994); *Clark v. O'Dea*, 257 F.3d 498, 503 (6th Cir. 2001).  Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons*, 34 F.3d at 357 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error.  *Id*.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States.  *Id.*  In this respect, it is recognized that "errors of state law" which render a trial fundamentally unfair violate the constitutional guarantee of due process and, therefore, can serve as the basis for habeas relief.  *See Norris v. Schotten*, 146 F.3d 314, 328-29 (6th

Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68). Fundamental fairness does not, however, "require a perfect trial." *Clemmons*, 34 F.3d at 358.

When objection was initially raised to this testimony, the prosecutor clearly stated that it "is not being offered to show a previous conviction," but was instead being offered to refute Dr. Shappell's testimony that Petitioner feared guns. (Trial Transcript, January 24, 1996, 125-26). The trial judge accepted the evidence for this limited purpose. *Id.* at 126. When Dr. Johnson later presented testimony regarding Petitioner's previous conviction, the trial judge sustained Petitioner's objection, indicating that the evidence was permissible for only a limited purpose. (Trial Transcript, February 5, 1996, 19).

The Court discerns nothing improper about the evidence at issue being admitted for this limited purpose. This evidence was relevant to refute Dr. Shappell's assertion that Petitioner feared guns. Moreover, the trial judge clearly indicated that the evidence would not be considered for any other improper purpose. The Court concludes, therefore, that the admission of this evidence did not deprive Petitioner of the right to a fair trial. Thus, this particular claim is without merit.

## V.      Failure to Produce Res Gestae Witness Claim (Habeas Claim VII)

At the time of Petitioner's trial, the State of Michigan had in effect a rule which required the prosecutor to "attach to the filed information a list of all...res gestae witnesses known to the prosecuting attorney or investigating law enforcement officers." Mich. Comp. Laws § 767.40a(1) (1993). This provision further provided that the "prosecuting attorney or investigative law enforcement agency shall provide to the defendant, or defense counsel, upon request, reasonable assistance, including

investigative assistance, as may be necessary to locate and serve process on a witness." Mich. Comp. Laws § 767.40a(5).

Petitioner asserts that the prosecuting attorney failed to exercise due diligence in attempting to locate and produce res gestae witness Barbara Joiner. Petitioner asserts that this failure necessitates the reversal of his conviction. Under federal law, however, there exists no such requirement. *See Smith v. Elo*, 1999 WL 1045877 at *2 (6th Cir., Nov. 8, 1999) (claim that prosecutor failed to call a res gestae witness is a state law issue not cognizable in federal habeas proceeding); *Moreno v. Withrow*, 1995 WL 428407 at *1 (6th Cir., July 19, 1995) (absent a denial of fundamental fairness, failure to call a res gestae witness is not cognizable in federal habeas proceeding); *Atkins v. Foltz*, 1988 WL 87710 at *2 (6th Cir., Aug. 24, 1988) ("federal law does not require the production of all res gestae witnesses").

The federal courts can only consider habeas claims alleging violations of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). Petitioner's claim rests upon a perceived violation of state law, therefore, relief is available only if the alleged error deprived Petitioner of "fundamental fairness in the trial process." *Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). However, because Petitioner has presented neither evidence nor argument that Barbara Joiner would have provided favorable testimony, he cannot establish that the alleged failure to secure her attendance at trial denied him of the right to a fair trial. *See Atkins*, 1988 WL 87710 at *1 (citing *United States v. Bryant*, 461 F.2d 912, 916 (6th Cir. 1972)); *Thomas v. McLemore*, 2001 WL 561216 at *6 (E.D. Mich., Mar. 30, 2001) (citing *Atkins*, 1988 WL 87710 at *2 and *Bryant*, 461 F.2d at 916).

**VI.**          **Improper Bind-Over Claim (Habeas Claim VIII)**

Petitioner asserts that because his confession was improperly admitted at his preliminary examination, the trial court lacked jurisdiction under state law to try him in this matter. However, Petitioner's claim that the state court lacked jurisdiction under state law to conduct his criminal trial is a matter of state law which is not cognizable in a federal habeas corpus proceeding. *See Strunk v. Martin*, 27 Fed. Appx. 473, 2001 WL 1450740 at *2 (6th Cir., Nov. 6, 2001) (citations omitted); *Gamez v. Jones*, 1999 WL 33483583 at *1 (W.D. Mich., Aug. 9, 1999); *Wright v. Angelone*, 151 F.3d 151, 158 (4th Cir. 1998); *Poe v. Caspari*, 39 F.3d 204, 207 (8th Cir. 1994).

**VII.**         **Ineffective Assistance of Trial Counsel Claims (Habeas Claims III and VI)**

Petitioner asserts that he was denied the right to the effective assistance of trial counsel guaranteed by the Sixth Amendment to the United States Constitution. Specifically, Petitioner asserts that his trial counsel failed to render constitutionally adequate assistance by: (1) failing to request a continuance to prepare for an evidentiary hearing, (2) failing to assert an insanity defense, (3) failing to object to the introduction of Petitioner's previous conviction for carrying a concealed weapon, (4) failing to request a continuance so that Dr. Shappell could perform further testing, and (5) failing to advise Petitioner of his right to testify.

To establish that counsel's performance was constitutionally deficient, Petitioner must first establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, it must be demonstrated that counsel's actions were unreasonable under prevailing professional norms. *Id.* at 688. In making this determination, however, the Court must "indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689.

Second, Petitioner must further establish that counsel's performance was prejudicial in that it denied him a fair trial.  *See Id.* at 687; *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so <u>manifestly</u> ineffective that defeat was snatched from the hands of probable victory."  *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (*en banc*), *cert. denied*, 113 S. Ct. 2969 (1993) (emphasis in original); *see also, West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).

For the reasons discussed below, Petitioner's claims of ineffective assistance of trial counsel are without merit.

### A.     Failure to Request Continuance

Petitioner asserts that counsel was ineffective for failing to request a continuance to prepare for the evidentiary hearing at which Petitioner challenged the admissibility of his confession to Officer Childs.  With respect to the admissibility of Petitioner's confession, counsel stated that she had discussed the matter with Petitioner "at the beginning of my representation and several times after." (Trial Transcript, January 22, 1996, 3).  Counsel concluded that there existed neither a factual nor a strategic basis for challenging the admissibility of the statement.  However, as trial was set to begin Petitioner requested that his counsel challenge the admissibility of his confession.  *Id.*  At Petitioner's request, counsel proceeded with the hearing, vigorously and competently challenging the admissibility

of Petitioner's confession in a lengthy hearing.  Moreover, as previously discussed, Petitioner's claim that his confession was improperly admitted is without merit.

        B.        Failure to Assert an Insanity Defense

Petitioner claims that his attorney rendered ineffective assistance by failing to assert on his behalf an insanity defense.  This claim is without merit, as there exists no evidence even suggesting that Petitioner was insane at the time he murdered Freddie Campbell.  It should further be noted that Dr. Shappell, Petitioner's expert witness, testified that at the time Petitioner killed Campbell he did not suffer from any mental illness.  (Trial Transcript, January 24, 1996, 74, 100).

        C.        Failure to Object

Petitioner asserts that his attorney failed to object to the admission of testimony regarding his previous conviction for illegally possessing a firearm.  Counsel successfully objected to the testimony at issue, both times it was elicited.  (Trial Transcript, January 24, 1996, 125-26; Trial Transcript, February 5, 1996, 18-19).  The prosecutor clearly stated that this testimony "is not being offered to show a previous conviction," but was instead being offered to refute Dr. Shappell's testimony that Petitioner feared guns.  As previously discussed, consideration of this testimony to refute Dr. Shappell's testimony was not improper.  The trial court clearly indicated that the evidence would not be considered as "prior bad acts" evidence, but would instead only be considered to refute Dr. Shappell's testimony.  Thus, counsel's performance was in no way defective with respect to this issue.

D.        Failure to Request a Continuance for Dr. Shappell

Petitioner asserts that counsel was ineffective for failing to request a continuance so that Dr. Shappell could perform additional testing.  As Petitioner correctly notes, Dr. Shappell did indicate that he experienced difficulty obtaining "the total picture" of Petitioner's mental condition.  (Trial Transcript, January 24, 1996, 81, 83, 92-93, 128).  Contrary to Petitioner's argument, the doctor did not testify (or even suggest) that this shortcoming could have been rectified with further testing or examination.  Instead, Dr. Shappell repeatedly testified that the problems he experienced diagnosing Petitioner's condition were due to Petitioner's "pretty extensive history of substance abuse." *Id.*  There is no evidence that this shortcoming could have been alleviated through additional testing.

E.        Failure to Advise Petitioner of his Right to Testify

Petitioner asserts that his trial counsel was ineffective for failing to properly advise him that he possessed the right to testify in his own behalf.  Petitioner offers no evidence to support this claim.  On the other hand, counsel made the following statement at the close of Petitioner's defense:

> At this time the Defense would rest.  I have discussed this decision with
> my client and my client agrees it is an appropriate time to rest.

(Trial Transcript, February 5, 1996, 3).

While this is not definitive evidence, it certainly suggests that counsel discussed this matter with Petitioner.  In sum, there is no evidence that counsel failed to inform Petitioner of his right to testify.  However, even accepting as true Petitioner's assertion he cannot establish that he suffered a violation of his constitutional rights.

To establish a violation of his right to the effective assistance of counsel, Petitioner must demonstrate that he was prejudiced by counsel's allegedly deficient performance.  To establish prejudice,

Petitioner must detail what his testimony would have been and establish that the consideration of such testimony would likely have resulted in a different outcome.  *See United States v. Aikens*, 2005 WL 433440, - - - F.Supp.2d - - - (E.D.Pa., Feb. 25, 2005) (citations omitted); *United States v. Betancur*, 2004 WL 25254 at *3 (2d Cir., Jan. 5, 2004) (citations omitted).  Petitioner has failed to articulate what his testimony would have been other than to indicate that he would have "been able to provide the trier of fact with a different view of the facts."  This is insufficient to establish prejudice.  *See Aikens*, 2005 WL 433440 (petitioner's conclusory assertion that he would have "set the record straight" is insufficient to establish prejudice for allegedly failing to inform petitioner of the right to testify).

Furthermore, to the extent that Petitioner's claim is interpreted as violating his Fifth and Sixth Amendment right to testify, the result is the same.  The Sixth Circuit has held that "[a]lthough the ultimate decision whether to testify rests with the defendant, when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed."  *United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000) (citations omitted).  Waiver of the right to testify "is presumed from the defendant's failure to testify or notify the trial court of the desire to do so."  *Id.* (citation omitted).

## VIII.        Ineffective Assistance of Appellate Counsel (Habeas Claim IX)

Petitioner asserts that his appellate counsel was ineffective for failing to assert on direct appeal the claim that Petitioner's trial counsel rendered ineffective assistance.  As discussed above, however, Petitioner's claim of ineffective assistance of trial counsel is without merit.  Appellate counsel was not deficient, therefore, for failing to assert this claim.

## CONCLUSION

For the reasons articulated herein, the Court concludes that Petitioner is not being confined in violation of the United States Constitution. Accordingly, the Court recommends that his petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: June 20, 2005                     /s/ Ellen S. Carmody
                                        ELLEN S. CARMODY
                                        United States Magistrate Judge